**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| JONATHAN DANIEL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 cv 01232 |
| | ) | |
| v. | ) | Honorable James E. Shadid |
| | ) | Magistrate Judge Schanzle-Haskins |
| THE CITY OF PEORIA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S CORRECTED OPPOSITION TO DEFENDANTS'**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

## I.    Introduction

Mayor Jim Ardis had his feelings hurt by an anonymous person on the internet. Someone created a parody Twitter account with the handle @peoriamayor and posted bawdy tweets, which directly contrasted with Ardis' serious, buttoned-up public image. No reasonable person or police officer would believe that Ardis, a staid local politician, was regularly and publicly posting about using drugs on the top of the civil center or visiting strip joints, or that the writer ever intended for readers to believe that Ardis was in fact the author of the tweets. Nevertheless, Ardis did not ignore the account. Rather than publicly announce the account was fake, or set up his own official account, Ardis and other city employees agreed to hunt down, expose, and punish the person responsible for the parody. City employees threatened Twitter with legal sanctions unless it shut down the account and silenced plaintiff's protected speech. In response, Twitter closed the account after it had been active for only 12 days. The police department opened a criminal investigation and applied for warrants to seek the speaker's identity, including the IP address through which the account was created, and the associated residence. Upon learning the address of the residence where the account was created, the police department

obtained a search warrant for plaintiff's home, searched it, and seized plaintiff's electronic devices. After finally identifying Jonathan Daniel as the operator of the account, the police arrested him and took him to the police station. There, they read him his *Miranda* rights, which he invoked. Then, without a warrant, they seized his phone. Soon after, the state's attorney announced that he would not bring charges against Daniel for his Twitter account because he had not violated the statute criminalizing personation of a public official.

Defendants violated Daniel's rights under the First and Fourth Amendments to the U.S. Constitution, the Privacy Protection Act, the Illinois Constitution, and Illinois tort law. Daniel's parody is protected speech which could not lawfully be silenced, nor be the grounds for punishment. Defendants' conduct causing the closing of the account is a traditional prior restraint on speech. Defendants also retaliated against Daniel because of his speech by using their law enforcement powers to hunt down and expose his identity, search his home, arrest him, and seize his property. These same searches and arrests also violate the Fourth Amendment because the City did not have probable cause under the Illinois statute prohibiting personation of a public official for the search warrants or the arrest. His protected speech could not constitute a violation of the statute; his expression did not evidence the required intent to deceive; and the statute explicitly excludes personation of a public official from the list of personation crimes that can be committed on the internet. Further, defendants cannot rely on the search warrants because of the circumstances above and because the warrant applications failed to include key information that showed that this was a parody account.

Defendants move for judgment on the pleadings asserting that probable cause and "arguable" probable cause defeat the claims. Not so. There is no probable cause, or arguable probable cause for the searches or arrest. In any case, probable cause and qualified immunity are

both fact based assessments and Daniel is not required to plead all facts to establish either at this stage.  Additionally, Daniel alleges that defendants violated the First Amendment by working to close the account.  The defendants' motion does not address this claim and it is not impacted by a finding of probable cause because it does not implicate the Fourth Amendment.  The First Amendment retaliation claim is also not defeated by probable cause, or arguable probable cause because Daniel has pled that defendants' motivation was to punish his speech.  Further, if the court finds no probable cause, but does find the individual defendants are shielded by qualified immunity because of "arguable" probable cause, Daniel has properly pled, and defendants have not challenged, damage claims against the City under *Monell* and claims for injunctive and declaratory relief.

## II.       Standard for a Motion for Judgment on the Pleadings

In reviewing defendants' Rule 12(c) motion, all of the factual allegations in the complaint must be taken as true and all reasonable inferences drawn in plaintiff's favor. *Adams v. Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014) (reviewing a judgment on the pleadings under the same standards as a Rule 12(b)(6) motion to dismiss). A complaint should not be dismissed unless it fails to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[1]

---

[1]       In the memorandum in support of their motion, defendants improperly relied on facts in an affidavit attached to their answer. *See* Dkt. 29, Motion to Strike. "[D]ocuments that are neither included in the plaintiff's complaint nor central to the claim should not be considered on a motion to dismiss." *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002). The affidavit is neither referred to in the complaint nor central to any of Daniel's claims and should be excluded from consideration. *See, e.g.*, *See v. Strunk*, No. 06-2064, 2006 WL 2916819, at *5 (C.D. Ill. 2006) (ruling  that an affidavit prepared by the defendant and attached to motion to dismiss was outside the pleadings and refusing to consider it until the summary judgment stage). If the court considers the affidavit, plaintiff seeks discovery under Rule 56(d)(2). *See also* Rule 12(d) (converting a motion under 12(c) to one for summary

### III.     Defendants' Motion Does Not Dispense With All of the Claims

Defendants' motion for judgment on the pleadings, even if granted, would not dispose of all of Daniel's claims. The motion for judgment on the pleadings on the First Amendment claims is based only on qualified immunity. Although the motion seeks dismissal of all defendants, qualified immunity does not apply to the City. *Hedge v. County of Tippecanoe*, 890 F.2d 4, 8 (7th Cir. 1989); *Benedix v. Vill. of Hanover Park, Ill.*, 677 F.3d 317, 318-19 (7th Cir. 2012). Second, defendants' qualified immunity argument does not apply to claims against any defendants' conduct of threatening Twitter in order to close the account and it does not apply to injunctive relief. *See Pearson v. Callahan*, 555 U.S. 223, 242-243 (2009).[2]

### IV.     Statement of Facts

On March 9, 2014, Jonathan Daniel began posting tweets to a parody Twitter account he created, "@peoriamayor," using a picture of Ardis as the profile photograph. Am. Compl. ¶ 18. The biography stated: "I am honored to serve the citizens of our great city." *Id.* ¶ 18. The account, which juxtaposed the mayor's clean-cut image with a series of tweets conveying in a crude or vulgar manner an exaggerated preoccupation with sex, drugs, and alcohol, was clearly a satire or parody. *Id.* ¶ 20. On or around March 12, Daniel added "parody" to the biography confirming that the account was a parody. *Id.* ¶ 19.

---

judgment if the court considers outside pleadings). In any event, if defendants' motion is granted, plaintiff should be granted leave to file an amended complaint. Rule 15(a)(2).

[2]     Additionally, plaintiff has pled five additional claims in his amended complaint: the state torts of false imprisonment, abuse of process, and intrusion on seclusion, as well as a claim under the Privacy Protection Act. *See* Am. Compl. ¶¶ 72-102.

Twitter is a social networking site that allows users to send and read 140-character messages called "tweets."[3] *Id.* ¶ 22. People with accounts can post tweets and also "follow" other accounts to see their tweets on their home page, but anyone can see tweets posted from a public account. *Id.* ¶ 22. People use Twitter to share news articles, comment on current events, and play fictional personas. *Id.* ¶ 22. There are many parody accounts, which often use pictures of the person they are parodying in their profile, including of Barack Obama (@The PresObama), sports figures (@drunkcutler), and local politicians (@MayorEmanuel). *Id.* ¶ 22. These accounts are often, but not always, marked "parody" or "fake" in the biography. *Id.* ¶ 22. Twitter explicitly allows parody accounts and permits them to be explicitly designated as such. *Id.* ¶ 22. Twitter also marks with a "check" the real accounts of certain influential people. *Id.* ¶ 22. *See e.g.* @RahmEmanuel. Twitter did not mark the account with a check. *Id.* ¶ 22. Daniel's parody was not unusual in this flourishing online community. *Id.* ¶ 22.

Someone texted Patrick Urich, the City Manager of Peoria, about the "@peoriamayor" Twitter account on March 10, 2014. *Id.* ¶ 25. After viewing the account, Urich responded, "Fake site. No way it could be his." *Id.* ¶ 25. Despite recognizing that the account was not truly purporting the tweets to be those of the real mayor, Urich began working with other members of city government to close the account, learn and expose the identity of the creator, and punish him for making the account. *Id.* ¶ 26. He worked with Jim Ardis, the Mayor of Peoria; Christopher Setti, the Assistant City Manager; Sam Rivera, the Chief Information Officer; Sonni Williams, the Interim Corporation Counsel for the City; Steve Settingsgaard, Chief of Police of the Peoria

---

[3]     See *U.S. v. Cassidy*, 814 F. Supp. 2d 574, 576-579 (D. Md. 2011), comparing Twitter to other methods of speech. *See also* Twitter's FAQ: *https://support.twitter.com/groups/50-welcome-to-twitter/topics/203-faqs/articles/13920-new-user-faqs*.

Police Department; and James Feehan and Stevie Hughes, Jr., detectives in the Peoria Police Department. *Id.* ¶¶ 27-58. All are defendants, including the City of Peoria. *Id.* ¶¶ 6-13.

Many City employees worked diligently to close the "@peoriamayor" account. *Id.* ¶¶ 27-58. On March 11, 2014, Rivera asked Twitter to close the account and enlisted the help of Urich, Setti, and Ardis to upload a copy of Ardis' driver's license to demonstrate that Rivera was acting on Ardis' behalf. *Id.* ¶ 28. The next evening, after receiving no response, Setti asked Settingsgaard to have the police department act, noting, "maybe they [Twitter] will respond to the Police more than an IS guy and the Assistant City Manager." *Id.* ¶ 30. The next day, Settingsgaard put Feehan on the task. Feehan asked Twitter to close the account and demanded that it maintain records of the account, falsely claiming that the account violated the law. *Id.* ¶ 31. The account remained active until March 20, 2014, when Ardis and the City, in a letter to Twitter written by Sonni Williams, Interim Corporation Counsel for the City, threatened to file a federal lawsuit seeking an injunction against Twitter to terminate the account. *Id.* ¶ 35. Twitter suspended the account that day. *Id.* ¶ 35. The account had been open for only 12 days. *Id.* ¶¶ 18, 35.

During the same time period, the City launched a criminal investigation. *Id.* ¶¶ 29-32. Although Feehan initially stated that the Twitter account did not violate any criminal law, days later, he erroneously claimed to Settingsgaard that it violated 720 ILCS 5-17-2 (b)(2), which prohibits false personation of a public official. *Id.* ¶¶ 29, 31. On March 13, 2014, Settingsgaard reported this position to Ardis and asked if Ardis wanted to file a formal complaint against the creator of the account. *Id.* ¶ 31. Ardis responded that he "absolutely" wanted to prosecute and "bring it on." *Id.* ¶ 31. At the time, the account was already explicitly labeled "parody." *Id.* ¶ 19.

The next day, March 14, 2014, Feehan, at Settingsgaard's direction and in furtherance of the defendants' plan, applied for and received the first of several warrants, based on the same false personation provision. *Id.* ¶ 32. The first was to Twitter ("Twitter warrant"), to learn who created the account. *Id.* ¶ 32. Twitter provided the internet protocol address ("IP address") used to create the account. *Id.* ¶ 32. Next, Hughes applied for and received a warrant to Comcast ("Comcast warrant") for the identity of the person and residence connected to the IP address. *Id.* ¶ 36. The third warrant was to search that residence ("house warrant"). *Id.* ¶ 39.

The detectives did not have probable cause or any other lawful basis to apply for the warrants and the applications had critical defects, including omitting facts which would show that the account was a parody. *Id.* ¶¶ 32, 36, 39, 51. Additionally, the applications for the Twitter and Comcast warrants falsely stated that the officers were searching for violations of "child pornography laws" when there was no evidence connecting Daniel or the Twitter account to child pornography. *Id.* ¶ 51e. The application for the house warrant also requested seizure of "cocaine, heroin, [and] drug paraphernalia" even though these items would provide no evidence of false personation. *Id.* ¶¶ 39, 51f.

Throughout this time, Mayor Ardis repeatedly encouraged the other defendants to close the account and punish its creator. For example, on March 12, 2014, Ardis directed Urich, Settingsgaard, and Rivera to act with a "sense of urgency" in closing the account. *Id.* ¶ 30. When he learned of a delay by Williams in completing the TRO letter, Ardis complained, "Wonder if she would've done it quicker if it was her name & pic?" *Id.* ¶ 34. Upon learning of the closure of the account, Ardis reiterated that he wanted to "be sure we find out who's doing this[.]" *Id.* ¶ 35.

Detective Hughes searched Daniel's home on April 15, 2014. *Id.* ¶ 40. Two of Daniel's roommates and two guests were in the home. *Id.* ¶ 40. The officers seized Daniel's and his

roommates' mail, computers, telephones, and other electronic devices. *Id.* ¶ 40. After executing the warrant, Hughes interviewed one of Daniel's roommates at the police station. *Id.* ¶ 41. During the recorded interview, Hughes stated, "my public perception of the Mayor, I would say that he's probably not the person responsible [for the Twitter account]. I would say with a great deal of certainty, a 100% deal of certainty, he's not the person that is on that site portraying those things." *Id.* ¶ 41. He also acknowledged the account was a "parody." *Id.* ¶ 41.

Daniel was at work when the officers searched his home. *Id.* ¶ 42. Shortly after his shift ended, Daniel was arrested and taken to an interrogation room at the police station, where Hughes informed him of his rights under *Miranda v Arizona*. *Id.* ¶¶ 43-45. When Daniel promptly invoked his right to an attorney, Hughes confiscated Daniel's cellular phone and released him. *Id.* ¶ 47. There was no warrant to arrest or to seize the phone (outside of the residence) and no probable cause or any other lawful reason for Daniel's arrest or seizure of his cell phone. *Id.* ¶¶ 43, 47. Two days later, on April 17, 2014 Hughes applied for two additional warrants, citing the false personation of a public official statute: one to search Daniel's cellular telephone ("phone warrant") and another to Google regarding the email account associated with the Twitter account ("Google warrant"). *Id.* ¶ 49. Hughes did not have probable cause or any other lawful basis to apply for either warrant. *Id.* ¶ 49. The phone warrant application suffered the same defects as the application for the house warrant; the Google warrant suffered the same defects as the Comcast warrant. *Id.* ¶ 51. A Peoria County Circuit Court judge issued both warrants. *Id.* ¶ 49. On information and belief, Hughes and Feehan thereafter searched Daniel's electronic devices for records of communications and other data. *Id.* ¶ 50.

After being released from police custody, Daniel believed he would be charged and prosecuted for a crime for which he could serve up to a year in prison. *Id.* ¶ 52. Daniel could not

visit with his three- and five-year-old sons on April 18 and 19 because he feared they would witness his arrest. *Id.* ¶ 53. He also suffered the loss of his only phone, which he used to coordinate visits with his children and with his sick grandmother, who often called him when she needed help. *Id.* ¶ 47. His relationships with his roommates were strained because of the search of the premises and the seizure of his roommates' property. *Id.* ¶ 52. He worried police officers would view highly personal digital photographs, written electronic documents, and texts on his laptop, computer, and telephone. *Id.* ¶ 52. He believed he might have to leave Peoria because defendants had shown they would take illegal actions against him, and he feared they would continue to retaliate against him for the Twitter account. *Id.* ¶ 53.

Daniel did not learn that he would not be charged with a crime until April 23, 2014, when it was reported in the Peoria Journal Star. *Id.* ¶ 54. The article stated that the State's Attorney of Peoria County decided not to prosecute Daniel for false personation of a public official. *Id.* ¶ 54. The State's Attorney stated that Daniel's conduct did not violate the statute because false personation of a public official under 720 ILCS 5/17-2(b)(2) had to be done in person and the statute could not be violated over the Internet or through electronic communication. *Id.* ¶ 54. Despite learning he would not be prosecuted, the police refused his repeated requests to return his cell phone and other property until May 2, 2014, more than a week later. *Id.* ¶ 55.

<u>Argument</u>

**V.     The Twitter Account was Protected Speech**

In our country, one is allowed to make fun of elected officials, including the mayor. The Supreme Court has recognized that "one of the prerogatives of American citizenship is the right to criticize public men and measures." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 51 (1988) (finding that a parody cartoon that purported that Jerry Falwell lost his virginity to his mother in

an outhouse was protected speech), quoting *New York Times v. Sullivan*, 376 U.S. 254, 271 (1964). Parody and satire are one method of such protected critique:

> Satire is particularly relevant to political debate because it tears down facades, deflates stuffed shirts, and unmasks hypocrisy. By cutting through the constraints imposed by pomp and ceremony, it is a form of irreverence as welcome as fresh air.

*Falwell v. Flynt*, 805 F.2d 484, 487 (4th Cir. 1986) (Wilkinson, J., dissenting), *rev'd sub nom. Hustler*, 485 U.S. at 46 (internal citations omitted).

Parodies and satires are protected in the context of personation laws. The Illinois personation statute forbids a person to "knowingly and falsely represent[] himself or herself to be … a public officer [or] employee." 720 ILCS 5/17-2 (b)(2). In *People v. Thoennes*, 334 Ill. App. 3d 320, 327 (4th Dist. 2002), the court analyzed an earlier version of the statute, which had the same operative language. Rejecting a facial challenge to the act, the court held that "[a]n actor or Halloween masquerader" would not violate the Illinois personation statute because "[t]here is no conscious intent on either's part to deceive the public that they are acting in the official capacity of a police officer." 334 Ill. App. 3d 320, 327 (4th Dist. 2002); *see also id.* at 329 (denying first amendment overbreadth challenge based on this reasoning). Other courts addressing facial challenges to similar personation statutes have also held that the statutes do not criminalize parody, play acting, and costuming because such expression does not evidence the required intent to deceive. *See United States v. Tomsha-Miguel*, 13-10342, 2014 WL 4358466, at *6-7 (9th Cir. Sept. 4, 2014) (finding that parody would not meet the intent requirement of the federal personation statute); *United States v. Chappell*, 691 F.3d 388, 393 (4th Cir. 2012) *cert. denied*, 133 S. Ct. 965 (2013) (finding constitutional Virginia's false personation of an officer statute: "Of course, it is ludicrous to suggest that costumed party-goers, children, and actors will be

prosecuted for pretending to be police officers."); *see also United States v. Rippee*, 961 F.2d 677, 679 (7th Cir. 1992) ("The [federal personation] statute does not punish mere puffing.")[4]

Courts use a "reasonable reader" standard to determine whether a statement is a parody. *See Alvarez*, 132 S. Ct. at 2547, 2557 ("some statements nominally purporting to contain false facts in reality 'cannot reasonably be interpreted as stating actual facts about an individual.'"), citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Farah v. Esquire Magazine*, 736 F.3d 528, 536 (D.C. Cir. 2013). Or, as explained in the trademark context, the court examines "whether a parodic character may reasonably be perceived." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 582 (1994).[5]

Courts look to several factors in deciding whether a statement is a parody. The first is context, which "includes not only the immediate context of the disputed statements, but also the type of publication, the genre of writing, and the publication's history of similar works." *Farah*, 736 F.3d at 535 (considering that a satiric article was posted among other satires on a blog),

---

[4]    Additionally, personation requires a "representation," 720 ILCS 5/17-2 (b)(2), which means a "presentation of fact," *see* Black's Law Dictionary. Therefore, to be liable under the act, a person would have to, through explicit speech or expressive conduct, knowingly and falsely present the fact that he or she is a public official. In *United States v. Alvarez*, the Court explained that parody, hyperbole or theatrical performances do not communicate actual facts and therefore cannot violate a law requiring a presentation of fact. 132 S. Ct. 2537, 2547 (2012) (finding that the Stolen Valor Act "by its plain terms applies to a false statement" and, therefore, "would not apply to, say, a theatrical performance"); *id.* at 2557 (Alito, J., dissenting) (finding that the act "applies only to statements that could reasonably be interpreted as communicating actual facts; it does not reach dramatic performances, satire, parody, hyperbole, or the like").

[5]    Whether a reasonable reader would understand the Twitter feed to be a protected parody, or a false representation is a question of law. *See Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) (holding "as a matter of constitutional law" that in context the word "blackmail" was used to criticize, rather than impute a crime); *Madison v. Frazier*, 539 F.3d 646, 655 (7th Cir. 2008) (finding that "even the most careless reader must perceive that this 'fantasy' was no more than rhetorical hyperbole" and therefore could not be actionable); *Mink v. Knox*, 613 F.3d 995, 1007-08 (10th Cir. 2010) (finding a blog which mocked a professor was a parody as a matter of law). *See also New Times, Inc.*, 146 S.W.3d at 156-161 (finding a satiric article protected as a matter of law) (collecting cases).

citing *Letter Carriers v. Austin*, 418 U.S. 264, 284-86 (1974). Twitter, as a forum, is rife with parody and impersonation and explicitly allows parody accounts. *See* Am. Compl. ¶ 22. Twitter also has a verification system for authentic accounts of influential people, including government officials, and marks authentic accounts with a check. *Id.* A reasonable reader would question the authenticity of an unverified Twitter account and would easily identify Daniel's expressive creation to be a parody, and by March 12, Daniel had explicitly confirmed by adding the word "parody" to the account. Am. Compl. ¶ 19.

In addition to context, courts also consider the text itself. *Farah*, 736 F.3d at 537. Here, the tweets were in stark contrast to the mayor's public persona. For example, on March 11, 2014, Mayor Ardis presided over a city council meeting, congratulating the high school band for their performance in the atrium, leading the assembly in a moment of prayer or silent reflection and then the pledge of allegiance, and presenting the "Math Counts" team from the public school with a proclamation. Am. Compl. ¶ 23. There are no publicly available reports in the media that suggest the Mayor was not his usual and proper person on this occasion. *Id.* . While the meeting was in progress, Daniel sent several tweets, including, "Well today sucked balls so ya already know what tonights bout … smoking crack Rivvvveeeerrrmmennn style." *Id.* . Other tweets posted to the account had similar content: "I'm thinking it's a tequila and stripper night it's jimmy baby" and "Im bout to climb the civic center and do some lines on the roof who's in." *Id.* ¶ 24. The tweets included rap lyrics; given the Mayor's public persona, a reasonable reader would not believe that Ardis was familiar with these songs, let alone that he tweeted lyrics from them.[6] *Id.* . The references to sex, alcohol, and drugs, in addition to the slang, grammar, and

---

[6]   "Champagne wishes dirty white bitches I mean this shit is fucking ridiculous[.]" Kanye West, "So Appalled" from the album My Beautiful Dark Twisted Fantasy (2010); "Gotta a [sic]

misspellings, indicate to any reasonable person that this was not the Peoria mayor's official account, a fact acknowledged by defendants Urich and Hughes. *Id.* ¶¶ 25, 41.

The context and content alone demonstrate that the account was a parody, so even though there was a brief period where the account did not have a "parody" label, the speech was protected. *Campbell*, 510 U.S. at 583, n.17 ("Parody serves its goals whether labeled or not, and there is no reason to require parody to state the obvious (or even the reasonably perceived)."). But Daniel labeled it a parody prior to the application for any warrants and the letter threatening a temporary restraining order, providing a further reason to believe it was a parody. Am. Compl. ¶ 19. *See Farah,* 736 F.3d at 537 (finding the author "can hardly be penalized for attempting to set the record straight and *avoid* confusion by those readers who did not at first 'get' the satirical nature").

The tweets may have insulted or shocked the mayor, but there is no requirement that anyone, including City Hall, be amused. "First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed." *Campbell,* 510 U.S. at 583, quoting *Yankee Publishing Inc. v. News America Publishing, Inc.*, 809 F. Supp. 267, 280 (SDNY 1992). And harsh, crude, unrefined speech is as protected as eloquent critiques. *Snyder v. Phelps*, 131 S. Ct. 1207, 1217 (2011) (protecting speech of protestors who held signs stating "God Hates the USA/Thank God for 9/11" and "God Hates You" outside of a military funeral); *Sloan v. Hatton*, 66 Ill. App. 3d 41, 42 (Ill. App. 4th 1978) ("Free speech is not restricted to compliments."). Public figures must have particularly thick skins to prevent stifling public debate. *Huster Magazine, Inc.*, 485 U.S. at 51 ("public figures as well as public officials will be subject to 'vehement, caustic, and sometimes unpleasantly sharp attacks'"), quoting *New*

_____

condo round my wrist girl and im cashing out." Ca$h Out, "Cashin Out" from the album It's My Time (2012). Am. Compl. ¶ 24.

*York Times*, 376 U.S. at 270. *See also Nelson v. Streeter*, 16 F.3d 145, 148 (7th Cir. 1994) (protecting a painting that "vilifies a public official with whom [defendants] had been associated").

## VI.    Defendants' Conduct Violated the First Amendment

The defendants violated Daniel's right to free speech under the U.S. and Illinois Constitutions by causing the Twitter account to be closed, which constitutes a prior restraint, seizing and retaining his electronic communication devices, and punishing Daniel for his speech by discovering his identity, raiding his home, seizing and searching his belongings, and arresting him.

### A.    Shutting the Twitter account was a prior restraint.

The defendants successfully caused the closure of Daniel's account by informing Twitter that his account violated the law, "ordering" Twitter to shut the account, and threatening legal sanctions if they did not. *See* Am. Compl. ¶¶ 28-35. The threat of legal repercussions to a third party constitutes the kind of "informal censorship" that the Supreme Court has recognized as an unconstitutional prior restraint. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963); *ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 423 (W.D. Pa. 1984) (finding that a mayor's letter, threatening prosecution of newsstands if they displayed *Hustler* magazine, was an unconstitutional prior restraint on speech, and granting an injunction); *Pilchesky v. Miller,* CV-05-2074, 2006 WL 2884445, *9 (M.D. Pa. Oct. 10, 2006) (reasonable jury could find a First Amendment violation where district attorney and police officer told webhost its customer was being criminally investigated and a court order would be sought to shut down message board if not removed voluntarily). Defendants, in their motion, do not move for judgment on this claim,

nor do they argue that damages for the claim would be defeated by qualified immunity. The claim is not subject to the motion and should stand.

B.       **Defendants prevented Daniel's speech by seizing and retaining his electronic devices.**

Defendants also prevented Daniel from further speech by seizing the electronic devices that allowed him to publish in his chosen medium—the internet. The Seventh Circuit recently found that "there is no fixed First Amendment line between the act of creating speech and the speech itself." *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 596 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 651 (2012).

> Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation. Thus, we have not drawn a hard line between the essays John Peter Zenger published and the act of setting the type. *Cf. Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,* 460 U.S. 575, 582 (1983) (holding that a tax on ink and paper "burdens rights protected by the First Amendment"). The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds.

*Id.*, quoting *Anderson v. City of Hermosa Beach,* 621 F.3d 1051, 1061-62 (9th Cir.2010). *See also Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 896 (2010) ("Laws enacted to control or suppress speech may operate at different points in the speech process."); *Potts v. City of Lafayette, Ind.*, 121 F.3d 1106, 1111 (7th Cir. 1997) (recognizing that the First Amendment was implicated by the seizing of recording equipment). Defendants violated Daniel's First Amendment rights by seizing and retaining his electronic devices, and holding them even after the State's Attorney announced he would not prosecute.

### C.    Defendants punished Daniel for his protected speech.

Daniel properly states First Amendment retaliation claims, which require that "(1) he engaged in activity protected by the First Amendment, (2) he suffered an adverse action that would likely deter future First Amendment activity, and (3) the First Amendment activity was 'at least a motivating factor' in the defendants' decision to retaliate." *Santana v. Cook Cnty. Bd. of Review*, 679 F.3d 614, 622 (7th Cir. 2012) (internal citations omitted); *see also Hawkins v. Mitchell*, 756 F.3d 983 (7th Cir. 2014).

First, Daniel's speech was constitutionally protected as a matter of law. *See supra*, Section V.

Second, defendants do not and could not credibly challenge that they deterred Daniel's future speech when they caused his account to be closed; criminally investigated him; raided his home; seized his belongings from his home; arrested him under an act that either does not apply to him or is unconstitutional as applied; seized his cell phone; prevented him from engaging in speech by retaining his electronic devices; and placed him in fear of prosecution. Am. Compl. ¶¶ 25-54. *See Hawkins,* 756 F.3d at 997 (finding an arrest an adverse action); *Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 917-18 (N.D. Ill. 2010) (finding repeated police "drive-bys" and surveillance of a house adverse actions).

Additionally, Daniel suffered an adverse action when the defendants deprived him of his anonymity, which is protected under the First Amendment. *Stone v. Paddock Publications, Inc.*, 356 Ill. Dec. 284, 292 (Ill. App. 1st) ("[A]n author is generally free to decide whether he wishes to disclose his true identity and his decision not to do so is an aspect of the freedom of speech provided in the first amendment."). *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995) ("The decision in favor of anonymity may be motivated by fear of economic or

official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible.").[7] Exposing an anonymous speaker is an adverse action because it deters such protected speech in the future.

Daniel also alleges the third requirement of a retaliation claim: defendants punished him for his speech because they objected to it. Am. Compl. ¶ 27; *see* Fed. R. Civ. P. 9 ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

### 1.    Probable cause does not defeat the retaliation claims.

Defendants, at 17-18, argue that they are entitled to judgment on the pleadings or qualified immunity if the court finds there was probable cause for the searches, seizures, and arrests. As demonstrated in Section VII, there was no probable cause, and therefore the First Amendment claims stand and no further analysis is needed.

Further, defendants' argument is not relevant to the adverse actions taken without warrants, such as closing the account because the Fourth Amendment is not implicated. *See* Am. Compl. ¶ 35. Regardless of whether there is probable cause, these claims stand.

Even if probable cause were present for the warrants and his arrest, Daniel may still maintain a claim that retaliatory animus was the reason for defendants' actions. Defendants rely on *Hartman v. Moore*, 547 U.S. 250, 265-66 (2006), which held that the plaintiff must plead (and prove) that there was no probable cause for retaliatory *prosecution* claims. Def. Mem. at 17. In *Reichle v. Howards*, 132 S. Ct. 2088 (2012), the Court, ruling on qualified immunity, declined to

---

[7]    Defendants claim, at 9 n.7, that they could have sought his identity through a subpoena instead of a warrant. That would not have cured any of defendants' unlawful conduct. Moreover, a subpoena would have provided greater protection because an anonymous speaker may move to quash on First Amendment grounds. *See Stone*, 356 Ill. Dec. at 292.; *Brompton Bldg., LLC v. Yelp!, Inc*., No. 1-12-0547, 2013 IL App (1st) 120547-U at *11 (Jan. 31, 2013) (refusing to disclose anonymous speaker); *In re Grand Jury Subpoena No. 11116275*, 846 F. Supp. 2d 1, 4 (D.D.C. 2012) (allowing anonymous tweeter to challenge grand jury subpoena on First Amendment grounds).

address whether *Hartman* would extend to arrests, but did acknowledge that arrests and prosecution claims are different because in retaliatory arrest cases, the proof is less complicated and the traditional deference to prosecutorial decision making is not present. *Id.* at 2096. This reasoning applies to retaliatory searches as well.

Since *Reichle*, courts have held that plaintiffs may state a claim where wrongdoers are improperly motivated by speech, even if there was probable cause for the arrest. *See Hernandez v. Cook Cnty. Sheriff's Office*, 07 C 855, 2013 WL 5913746 at *3 (N.D. Ill. Oct. 7, 2013) ("*Hernandez I*"); *Hernandez v. Cook Cnty. Sheriff's Office*, 07 C 855, 2014 WL 3805734, *5 (N.D. Ill. July 31, 2014) ("*Hernandez II*") (finding plaintiffs had created a triable issue of fact "regarding the motivation for Defendants' decision to investigate and discipline Plaintiffs *despite the fact that Defendants had probable cause* to take those actions") (emphasis added); *Ford v. City of Yakima,* 706 F.3d 1188, 1193 (9th Cir. 2013) (holding there is a right to be free from retaliatory police conduct even when supported by probable cause). *See also Zitzka*, 743 F. Supp. 2d at 920 (coming to the same conclusion prior to the *Reichle* decision and refusing to grant summary judgment on retaliatory arrest claims with probable cause where plaintiff could show that speech was the cause of the arrest).

Defendants argue, at 18, that qualified immunity defeats the claim, citing *Thayer v. Chiczewski*, 705 F.3d 237, 253 (7th Cir. 2012), for the proposition that there is no clearly established law on point. Not so. First, qualified immunity does not apply to *Monell* claims, *see Hedge*, 890 F.2d at 8, or to claims for injunctive or declaratory relief, *Pearson*, 555 U.S. at 242-243. Second, the court should not find qualified immunity because, after *Thayer* and *Reichle*, and before the actions in this case, courts have clearly established that plaintiffs may prove retaliation even when there is probable cause for an arrest. *Hernandez I*, 2013 WL 5913746 at *3; *Ford,*

706 F.3d 1188. *See also Jacobs v. City of Chicago,* 215 F.3d 758, 767 (7th Cir.2000) (holding that in determining whether there is clearly established law, in the absence of controlling precedent, courts should recognize "a clear trend in the caselaw" where it can be said "with fair assurance that the recognition of the right by a controlling precedent was merely a question of time") (internal citation omitted).

**VII.   Daniel has Stated Fourth Amendment Claims**

Defendants violated the Fourth Amendment when they searched Daniel's home, possessions, electronic devices, and personal information (the "Searches"); seized Daniel's possessions, including his mail, cellular telephone, computers, and other electronic devices (the "Seizures"); and arrested Daniel (the "Arrest")—all in furtherance of their plan to close the Twitter account and punish its creator. *See* Am. Compl. ¶¶ 39, 40, 45, 47. In their motion, defendants argue that they should be granted judgment on the pleadings with respect to these claims because they had probable cause or "arguable probable cause" for the Searches, Seizures and Arrest. Def. Mem. at 8-9. Defendants are wrong.

**A.     Defendants lacked probable cause for both the Searches and the Arrest.**

"Probable cause exists when the facts and circumstances within [the officer's] knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense." *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014) (internal quotation marks omitted). Additionally, "a police officer's mistake of law cannot support probable cause" because "[a]n officer cannot have a reasonable belief that a violation of the law occurred when the acts to which an officer points as supporting probable cause are not prohibited by law." *United States v. McDonald*, 453 F.3d 958, 961 (7th Cir. 2006). Here, the alleged "offense" cited in defendants' applications for warrants for the searches was a

provision of the Illinois false personation statute that criminalizes "knowingly and falsely" representing oneself to be a "public officer or a public employee." 720 ILCS 5/17-2(b)(2). Am. Compl. ¶¶ 31, 32, 36, 39, 49. That provision was the basis for the Arrest as well. Am. Compl. ¶ 46.

For the reasons stated below, Daniel has pleaded a more than plausible claim that there was no probable cause and that a prudent officer would *not* have believed Daniel violated §17-2(b)(2).[8] "However, it is well-settled that a plaintiff does not need to plead facts in order to survive a motion to dismiss, and the existence of probable cause is a fact-based inquiry that is more properly resolved on summary judgment." *Gay v. Robinson*, 08-4032, 2009 WL 196407, at *3 (C.D. Ill. Jan. 27, 2009); *See also Simpson v. Engle*, 10 CV 1394, 2011 WL 2014813, at *2 (C.D. Ill. May 24, 2011).  If the court cannot determine that there is no probable cause based on the facts in the complaint, it should defer until discovery has taken place.

### 1.      Probable cause cannot be based solely on protected speech.

As demonstrated in Section V above, Daniel's tweets were parody speech protected by the First Amendment. "[R]esting probable cause on [a party's] words alone is only appropriate if her words are unprotected speech." *Bass v. Hansen*, 09-cv-1087, 2010 WL 5069690, at *11 (N.D. Ill. Dec. 7, 2010); *Mink*, 613 F.3d at 1004 (collecting cases). Defendants cannot, as they tried to do here, assert probable cause based solely on protected speech—Daniel's tweets.

---

[8]      Defendants argue that their case for probable cause was stronger when they searched Daniel's house because by then, they knew not only that the Twitter account existed, but also that the email account associated with the account was "strikingly similar to [Daniel's] name and that the account was created from a computer device at the address where Plaintiff resided." Def. Mem. at 12. As argued below, there was no probable cause because the statute did not apply to Daniel's protected speech. Further, this fact is asserted in an attachment to the answer, Dkt. 17, Ex. 1; is not in the complaint; is subject to plaintiff's motion to strike; and should not be considered on this motion. *See*, 2006 WL 2916819 at *5.

      **2.**     **A reasonable person would have concluded that Daniel did not have a specific intent to deceive others into believing that Mayor Ardis was actually writing the tweets.**

The Illinois courts have held that the false personation statute is a regulation of speech that can only be violated if the defendant has a specific intent to deceive. *See Thoennes*, 334 Ill. App. 3d at 327; *People v. Farmer*, 350 Ill. Dec. 978, 984 (Ill App. 1st 2011). In *Thoennes*, the court considered a challenge to the provision making it a crime for a person "knowingly and falsely represent[] himself to be a peace officer." 334 Ill. App. 3d at 326. In *Farmer*, the court considered a First Amendment challenge to a similar statute that criminalized "falsely represent[ing]" oneself to be the parent, legal guardian, or other relation of a minor to a public official. In each case, the court held that the statute passed constitutional muster, either because the language of the statute required proof of specific intent, *Thoennes,* 334 Ill. App. 3d at 326, or because in the absence of such language the Constitution required that the court read such a requirement into the statute, *Farmer*, 350 Ill. Dec. at 984.[9] Accordingly, Daniel could only have violated the false personation statute if he had a specific intent to deceive.

That specific intent requirement dooms defendants' argument that the Searches and Arrest were supported by probable cause. The facts available at the time defendants sought the warrants, and at the time they carried out the Arrest, all point to a single conclusion: Daniel did not intend to deceive people into believing the Mayor was writing and posting the tweets.

---

[9]     The court in *Thoennes* interpreted a prior version of the false personation statute, 720 ILCS 5/32-5, which was repealed in 2011 and replaced with 720 ILCS 5/17-2, the statute at issue in the instant case. However, there is no material difference between the relevant language of the old and the new statutes. *Compare* 720 ILCS 5/32-5 (repealed 2011) ("A person who knowingly and falsely represents himself to be a peace officer of any jurisdiction commits a Class 4 felony") *with* 720 ILCS 5/17-2 ("A person commits a false personation if he or she knowingly and falsely represents himself or herself to be any of the following . . ."). Likewise, *Farmer* construed a statute criminalizing "falsely represent[ing]" oneself to require an intent to deceive, further indicating that an intent to deceive is required for false personation.

Defendants applied for warrants for the Searches on March 14, March 29, April 15, and April 17, and they arrested Daniel on April 17. Am. Compl. ¶¶ 32, 36, 39, 40-45, 49. At all relevant times, including when defendants applied for the warrants and when they arrested Daniel, the @peoriamayor account expressly stated on its home page that it was a "parody account." *Id.* ¶ 19. Defendants knew of that designation at least as early as March 14, when they first applied for a warrant for Twitter. *Id.* ¶ 32.[10] Those facts alone are dispositive.

Further, as argued above at 10-14, even without the express designation of the account as parody, no reasonable reader of Daniel's tweets would have concluded that the author of the tweets intended anyone to believe that they had in fact been posted by Mayor Ardis. This is not because it is wholly implausible that an elected official would engage in the antics described. But even our most shameless and poorly behaved politicians have not—and would not—commit political suicide by voluntarily outing their own outrageous and likely career ending transgressions on publicly accessible social media.

### 3. Section 17-2(b)(2) does not apply to representations made over the internet.

By its terms, §17-2(b) of the false personation statute does not apply to communications through "an internet web site or other means of electronic communication." The Twitter account and Daniel's tweets were communications made through an internet website and electronic

---

[10]     Defendants argue in their memorandum at 10 that their case for qualified immunity is enhanced because "the account was not labeled a 'parody' until after Defendants had already been alerted to its existence and had begun investigating." Even if true, the fact that the account was not labeled "parody" until after defendants' investigation began would be irrelevant. "'Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known' to the officer *at the time he acts*." *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010) (emphasis added), quoting *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004)). That information included the fact that the account was labeled a parody, belying any notion that the author intended to deceive readers that the tweets actually were authored by Mayor Ardis.

communications. Am. Compl. ¶ 21. Therefore, a prudent officer would not have concluded that the Twitter account and the tweets violated §17-2(b)(2).

All of the subsections of the false personation statute may be violated by conduct in person. Subsection (g) of the statute also provides an exception of sorts--that parts of subsection (a) and all of subsection (e) may also be violated by "use of an Internet website or any form of electronic communication." 720 ILCS 5/17-2(g). "Under the maxim of *expressio unius est exclusio alterius,* the enumeration of an exception in a statute is considered to be an exclusion of all other exceptions." *Schultz v. Performance Lighting, Inc.*, 376 Ill. Dec. 448, 452 (2013). Here, the exception that expressly applies to subsection (a) and (e) does not apply to violations of subsection (b)(2), the basis for defendants' searches.[11] Because the statute did not apply to the Twitter account and Daniels' tweets, there was no probable cause to believe he had committed an offense.[12] *See also McDonald*, 453 F.3d at 961 (holding that "[a]n officer cannot have a

---

[11]     The General Assembly clearly intended to exclude public officials from online personation because a prior version of the act applied to the entire personation section. *See* 2011 Ill. Legis. Serv. P.A. 97-219. The General Assembly amended the act to limit which forms of personation could be committed online, excluding personation of public officials. *See* 2012 Ill. Legis. Serv. P.A. 97-1109. *Bd. of Trustees of S. Illinois Univ. v. Dep't of Human Rights*, 159 Ill. 2d 206, 213 (1994) ("Where the legislature has made a material change in a statute … the presumption is that 'the amendment was intended to change the law.'") (internal citations omitted).

[12]     In their discussion on this point in their Memorandum at 14, defendants argue that this is a defense to a criminal charge, and that "Defendants' alleged failure to determine the application of a defense to a criminal charge does not detract from probable cause." Defendants are wrong. The fact that the conduct must be in person, rather than over the internet, is an element of the statute, not a defense. And, in any event, a police officer assessing probable cause may not ignore facts of which he has actual knowledge that establish the existence of an affirmative defense. *Hodgkins v. Peterson,* 355 F.3d 1048, 1061 (7th Cir. 2004). The case defendants cite on this issue, *United States v. Osborn*, 120 F.3d 59, 63 (7th Cir. 1997), does not set out any blanket rule that police officers may ignore possible defenses when determining probable cause. Rather, in *Osborn*, the court simply found that where the defendant raises a unique defense or interpretation of a statute that the courts have expressly declined to rule on, a prudent officer will not be required to make the call that the courts have not. Here, there was no need to reach a

reasonable belief that a violation of the law occurred when the acts to which an officer points as supporting probable cause are not prohibited by law.").

### 4. Defendants' attempt to justify the Arrest under a different statutory provision fails.

In their motion, and with respect to the Arrest only, defendants argue that they also had probable cause to arrest Daniel under a different provision of the false personation statute, 720 ILCS 5/17-2(a)(2.5)(A), which may be violated by electronic communication over the internet. While defendants may be correct that false personation under §(a)(2.5)(A) may be accomplished through internet communications, their arrest of Daniel under that provision would have lacked probable cause for all of the other reasons discussed above with respect to §(b)(2). Parody that is protected by the First Amendment cannot be criminalized under any statute. Further, §(a)(2.5)(A), like §(b)((2), requires an intent to deceive, and any prudent officer would have concluded Daniel did not have an intent to deceive when he tweeted as @peoriamayor. *See* 21-22.

### 5. There were material misrepresentations and omissions in the Warrant applications.

Defendants also violated the Fourth Amendment by "intentionally or recklessly withholding exculpatory facts that would have influenced the warrant-issuing judge's probable-cause finding" from the warrant applications. *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010). All of the warrant applications had serious defects.

The applications omitted key facts that showed the account was a parody. First, the applications failed to state in their narratives that the account was a parody. Am. Compl. ¶ 51a.

---

unique reading of the statute, and a reasonably prudent officer would have given the statute its most natural reading—that false personation of a public official is not violated when the defendant acts over the internet rather than in person.

This was plain from its inception because of the outrageous content and because the account was expressly designated as "parody" at the time of each warrant application. *Id.* ¶ 19. Second, while the application for the Twitter warrant attached a copy of the account, which was clearly marked "parody," the applications for the Comcast and Google warrants purported to, but failed to attach a copy of the account, depriving the court of even the opportunity to itself ferret out the "parody" designation. *Id.* ¶ 51b. The applications for the house and phone warrants did not purport to attach the account or, in fact, attach the account. *Id.* ¶ 51b. Third, the applications for the Comcast, house and Google warrants omitted that Hughes, the author of the applications, knew the account was a parody and knew from reading the account that the mayor was not the person sending the tweets. *Id.* ¶ 51c. By the time of the application of the house warrant and Google warrants, he had so admitted to third parties in a recorded statement. Fourth, none of the warrants stated that the account was not "verified," which is a Twitter mechanism for identifying authentic accounts for influential people, further confirming the account was a parody. *Id.* ¶¶ 51d, 22.

Each of these material misstatements and omissions tainted the warrants at issue by corrupting the judicial decision-making process. The materiality of an omitted fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause. *See Betker v. Gomez,* 692 F.3d 854, 862 (7th Cir. 2012) (to assess materiality the court must "eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting 'hypothetical' affidavit would establish probable cause"). By omitting the facts that showed that the Twitter account was an obvious parody from its inception, including being expressly labelled as such at the time the warrant applications were submitted, defendants withheld a key fact defeating probable cause.

As discussed above, the false personation statute did not—and under *Falwell* could not—criminalize parody Twitter postings.

The applications for the Twitter and Comcast warrants also were laden with false, inflammatory and grossly misleading innuendo. They stated that the officers were searching for violations of "child pornography laws" when there was no evidence connecting Daniel or the Twitter account to child pornography. Am. Compl. ¶ 51e. Additionally, the application for the house warrant sought "cocaine, heroin, [and] drug paraphernalia" even though there was no evidence suggesting that Daniel was in possession of drugs. *Id.* ¶ 51f. Defendants' gratuitous and false references to purported evidence linking Daniel's Twitter and Comcast accounts to child pornography and drugs inexcusably tainted the warrant process with false and highly prejudicial facts.

**B.     The defendants are not entitled to qualified immunity for their Fourth Amendment violations.**

Defendants' claim of qualified immunity should be denied. Qualified immunity is not appropriate unless the facts pleaded by plaintiff, taken as true, fail to allege that defendant's conduct violated a clearly established right, and that it would have been clear to a reasonable officer that his conduct was unlawful. *See Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001), *cited by Reher v. Vivo*, 656 F.3d 772, 775 (7th Cir. 2011) (discussing the qualified immunity standard for summary judgment).

Here, Daniel has pled sufficient facts to establish there is no probable cause. However, "the plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Alvarado*, 267 F.3d at 651-52. Therefore, the court should not grant qualified immunity based on the undeveloped facts in the complaint. *Id.* ("Because an

immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate.") (internal citation and quotation mark omitted).

      **1.**    **Qualified immunity does not apply to *Monell* and claims for injunctive and declaratory relief.**

First, qualified immunity does not apply to Daniel's claims against the City under *Monell*, *Hedge*, 890 F.2d at 8, or for injunctive and declaratory relief, *Pearson*, 555 U.S. at 242-243.

      **2.**    **Officers are not entitled to qualified immunity where the application contained false statements and omitted material facts.**

Second, defendants have conceded that a warrant does not protect an officer if his application contained false statements and omitted material facts. Def. Mem. at 9, citing *Whitlock v. Brown*, 596 F.3d 406, 410-11 (7th Cir. 2010); *United States v. Sims*, 551 F.3d 640, 645 (7th Cir. 2008)). As demonstrated above, at 24-26, defendants violated this clearly established law by omitting key facts from the warrant applications and by making false assertions.

      **3.**    **There is no qualified immunity because no reasonable and well trained officer would have believed that probable cause existed.**

Defendants argue that even if probable cause did not support the Searches or the Arrest, they are entitled to qualified immunity because there was "arguable probable cause." With respect to the Searches only, they also argue that the existence of the warrants "erects formidable obstacles to Plaintiff's effort to hold Defendants civilly liable." Def. Mem. at 9. Defendants overstate the protections provided by the four warrants.

In search, seizure, or arrest cases where an official has obtained a warrant, qualified immunity is not appropriate unless the facts pleaded by plaintiff, taken as true, fail to allege that "a reasonably well-trained officer" in the same position "would have known that his affidavit

failed to establish probable cause and that he should not have applied for the warrant." *See Malley v. Briggs*, 475 U.S. 335, 345 (1986); *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (same, citing *Malley*). *See also Meyer v. Robinson*, 992 F.2d 734, 739 (7th Cir. 1993) (affirming denial of qualified immunity where police officer signed affidavit in support of arrest warrant alleging fellow police officer battered a prisoner because "[n]o competent officer, reasonable or not, 'could disagree' that a warrant should not issue simply because an arresting officer breached the statutory elements of assault and battery while making an arrest"); *Draine v. Bauman,* 708 F. Supp. 2d 693, 708 (N.D. Ill. 2010) (denying qualified immunity to officers conducting search pursuant to warrant because no reasonable officer could have concluded that information provided by informant was sufficient to establish probable cause).[13] As to Daniel's warrantless arrest, the standard is similar. An official cannot have qualified immunity unless the facts pleaded by plaintiff, taken as true, show that "a reasonable officer could have mistakenly believed that probable cause existed." *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) (internal citations omitted).

Daniel had a clearly established constitutional right to be free from searches of his home, seizures of his property, and arrest, without probable cause. Defendants' pleadings do not dispute this. It would have been clear to any reasonable officer that there was no probable cause to believe that the false personation statute criminalized Daniel's internet political parody speech.

---

[13]     *Whitlock v. Brown*, 596 F.3d 406, 410-11 (7th Cir. 2010) and *United States v. Sims*, 551 F.3d 640, 645 (7th Cir. 2008), cited in defendant's memorandum at 9, are not to the contrary. *Whitlock* and *Sims* merely demonstrate that intentional or reckless lies or omissions are *one way* an officer's affidavit can fail to establish probable cause. The cases immediately preceding this footnote, including *Malley* and *Draine*, cited by defendants, demonstrate that when a reasonably trained officer would have known that there was no probable cause, a plaintiff need not show omissions or misstatements in order to defeat qualified immunity.

First, the false personation statute clearly did not apply to Daniel's protected speech. Since the *Falwell* decision in 1988, the clear law of the land has been that parody of public officials is protected and cannot be criminalized. *See Bass*, 2010 WL 5069690 at *14 (N.D. Ill. Dec. 7, 2010) ("There is perhaps no more obvious constitutional violation than arresting citizens for the content of their protected speech."). *See also Mink*, 613 F.3d at 1011 (denying qualified immunity defense where defendant based probable cause on protected speech).

Second, the statute on its face did not apply to Daniel's Twitter account because it clearly excluded personation of public officials over the internet, making it inapplicable to Daniel, and the established law made it clear that the statute requires an actual intent to deceive, also making it inapplicable to Daniel. *See* discussion above at p. 22-25. "An officer cannot have a reasonable belief that a violation of the law occurred when the acts to which an officer points as supporting probable cause are not prohibited by law." *See United States v. McDonald*, 453 F.3d 958, 961 (7th Cir. 2006). Defendants are not entitled to qualified immunity for enforcing a statute against Daniel that any reasonable officer would have concluded did not apply. *See, e.g.*, *Northen v. City of Chicago*, 126 F.3d 1024 (7th Cir. 1997) (no qualified immunity for misapplication of false personation statute to non-criminal behavior); *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986) (no qualified immunity for misapplication of child neglect statute to non-criminal behavior); *Cooper v. White*, No. CIVA 06C830, 2006 WL 2982143 (N.D. Ill. 2006) (no qualified immunity for misapplication of child abduction statute to non-criminal behavior); *Pritchard v. Hamilton Tp. Bd. of Trustees*, 424 Fed. Appx. 492 (6th Cir. 2011) (no qualified immunity for misapplication of underage drinking statute to non-criminal behavior).

Finally, defendants state in their memorandum at 11 n.9 that "[r]esearch has not uncovered a single case indicating" Daniel's conduct did not violate the law, and thus, that "can

hardly be viewed as obvious."[14] To the contrary, Daniel has cited two cases, *Thoennes* and *Farmer*, which hold that an intent to deceive is required for the personation statute. Other courts analyzing federal and other states' personation statutes also require such intent. *See supra* at Section V. These cases do not explicitly address an officer's claim of probable cause for personation of a public official where someone was engaged in a parody, "[b]ut the police cannot obtain immunity for liability for false arrests by arresting people on preposterous charges and then pointing to the absence of any judicial decision that declares the statutory interpretation underlying the charges to be preposterous. Their interpretation must be reasonable in light of existing law." *Northen v. City of Chicago*, 126 F.3d 1024, 1028 (7th Cir. 1997). Here, it was not

---

[14]    Defendants also cite two out-of-state cases involving statutes that are different from the one at issue in this case, and argue those two cases are "the most closely analogous" to the instant case. Def. Mem. at 11, n.9, citing *Clear v. Superior Court*, 2010 WL 2029016, at *2-3 (Cal. App. 4th Dist. May 24, 2010); *People v. Golb*, 23 N.Y.3d 455 (2014). In *Golb*, the court interpreted the meaning of "injure" in the New York personation statute, which required "an intent to obtain a benefit or *injure* or defraud another" to include an intent to harm the reputation of another. The defendant in *Golb* impersonated numerous scholars and professors so convincingly that at least two university Provosts responded to his impersonating emails, believing them to be authored by the subjects of the impersonations. Because the impersonations were convincing, they damaged the reputations of several scholars. *Golb* provides no assurance to Illinois law enforcement that they have probable cause that the Illinois statute, which contains no "injury" element, has been violated by a parody Twitter account which, to any reasonable reader, including police officers, would be considered a spoof, and not true facts that would damage reputation. *See supra* at 10-14. *See also Hustler Magazine*, 485 U.S. at 53 (dismissing intentional infliction of emotional distress claim because, while an intent to cause injury "may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate about public figures."). *Golb*'s conduct was so dissimilar to plaintiff's here, that it is of no consequence. In *Clear*, the court merely determines that publishing statements on a MySpace page constitutes "an act" additional to the false personation, as required by the California statute. The defendant had created a MySpace page under the name of a local pastor and then published statements that defamed others and indicated that the pastor was engaged in conduct for which he could be terminated from his job. There is nothing in the opinion that suggests that the defendant expressed himself in any manner that would make a reasonable police officer think the statements were satirical or humorous. And, while the defendant initially said it was a joke, he admitted he was upset with his sister's treatment by the church and knew that the pastor would suffer shame and humiliation. *Clear* and *Golb* are straightforward application of personation statutes to expression no court would consider to be protected speech.

reasonable to believe that a parody account evidenced intent of personation. Indeed, courts have upheld that personation statutes are not overly broad because they clearly do not reach parody and similar protected expression. *Thoennes*, 34 Ill. App. 3d at 327, 329. *See also Chappell*, 691 F.3d at 393 (rejecting challenge to personation statute because: "Of course, it is ludicrous to suggest that costumed party-goers, children, and actors will be prosecuted for pretending to be police officers."). And while there is no case law explicitly interpreting whether under Illinois' personation of a public official offense can be committed online, "[t]he fact that a statute has not been construed does not mean that there is no law, that anything goes. There is always the statute itself, and if its meaning is clear without benefit of judicial interpretation the officials enforcing it cannot reasonably go against it." *Northen*, 126 F.3d at 1028. *See also Vodak v. City of Chicago*, 639 F.3d 738, 747 (7th Cir. 2011) ("The absence of a reported case with similar facts may demonstrate nothing more than widespread compliance with well-recognized constitutional principles.")

> **4.  Defendants are not entitled to qualified immunity for the seizure and search of Daniel's phone.**

In order for defendants' warrantless seizure of Daniels' phone to be lawful, some exception to the warrant requirement must apply. The only basis defendants assert for probable cause and qualified immunity is that it was permissible to seize a phone incident to a lawful arrest. As discussed above, defendants lacked probable cause to arrest, and in fact had no reasonable basis for concluding that Daniel had committed any crime. Accordingly, the seizure of the phone was unquestionably unlawful.

Defendants cannot rely on the phone warrant for the search of the contents of the phone, because the warrant suffers the same clearly established constitutional deficiencies as the other warrants in this case. *See supra* pp. 26-31.

31

## VIII.   Daniel Properly Pled State Constitutional Claims

Daniel properly pled claims for injunctive and declaratory relief under the Article I, Sections 4 (free speech) and 6 (privacy) of the Illinois Constitution (*see* Am. Compl. ¶¶ 66-69); such claims are regularly allowed.[15] *See, e.g., Kole v. Vill. of Norridge*, 941 F. Supp. 2d 933, 959 (N.D. Ill. 2013) (denying a motion to dismiss a claim under the Illinois Constitution for a declaratory judgment); *McFadden v. Bd. of Educ.,* 05 C 0760, 2006 WL 6284486 at \*7-8 (N.D. Ill. Oct. 3, 2006) (allowing an injunctive claim under the Illinois Constitution).

Daniel has also properly pled a claim for damages under the Illinois Constitution. *See* Am. Compl. ¶¶ 66-69. There is an implied right of action under Section 4's protection of speech and Section 6's protection of privacy rights. IL CONST Art. 1, §§ 4, 6. *See Sawyer Realty Grp., Inc. v. Jarvis Corp.*, 89 Ill.2d 379, 386  (1982) ("[W]here it is consistent with the underlying purpose of [a statute] and necessary to achieve the aim of the legislation, a private right of action can be implied."). Courts have recognized private rights of action under the Illinois constitution. *See Grubbs v. Hous. Auth. of Joliet,* 91 C 6454, 1997 WL 281297 at \*28 n.17 (N.D. Ill. May 20, 1997) (Section 6 "authorizes personal suits against government actors"); *White v. O'Leary,* 742 F. Supp. 990, 992 (N.D.Ill.1990) ("Section 6 does give rise to a cause of action against public officials or government actors who violate citizens' rights contained therein."); *see also Newell v. City of Elgin*, 34 Ill. App. 3d 719, 725 (Ill. App. 2nd 1976) (plaintiff bringing a claim under

---

[15]     Defendants' cases do not address injunctive relief, or damages claims under Sections 4 and 6 of the Illinois constitution, but stand for the narrow proposition that the Illinois Human Rights Act provides an exclusive remedy for state law claims of discrimination, and therefore, there is no additional claim under Article I, Section 17 of the Illinois Constitution. Def. Mem. at 19, citing *Bonnstetter v. City of Chicago*, 13 C 4834, 2014 WL 3687539 (N.D. Ill. July 24, 2014) (finding "no private cause of action for violations of art. 1, § 2 of the Illinois Constitution against employers who commit civil rights violations."); *Teverbaugh ex rel. Duncan v. Moore*, 311 Ill. App. 3d, 6 (Ill. App. 1st 2000) (finding the Illinois Human Rights Act the sole mechanism for damages for a violation of article I, section 18).

both the Illinois and U.S. Constitutions for illegal police search sufficiently stated a cause of action).[16] Daniel's state constitutional claims should stand.

## IX.    Daniel Properly Pled Conspiracy Claims

As stated above, the constitutional claims should stand; therefore, there is no basis for judgment on the conspiracy claims. *See* Am. Compl. ¶¶ 70-71. *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 758 (N.D. Ill. 2012); *Kidd v. City of Chicago*, 02 C 9534, 2003 WL 22243938 at *2 (N.D. Ill. Sept. 26, 2003).

## X.    Conclusion

For the above reasons, defendants' motion for judgment on the pleadings should be denied.

---

[16]    Some courts have improperly rejected actions for damages under the Illinois Constitution because of the availability of federal remedies. *See, e.g., Doe v. Champaign Cmty. Unit 4 Sch. Dist.*, 11-CV-3355, 2012 WL 2370053 (C.D. Ill. Feb. 24, 2012). But finding a *state* right can be protected by a *federal* statute undermines the sovereignty of the State of Illinois and fails to provide a right of action for the broader protections of the Illinois constitution. *See e.g. People v. DiGuida*, 152 Ill.2d 104, 120 (Ill. 1992) (Illinois Constitution may provide greater protection of speech than the Federal Constitution).

Dated:  December 11, 2014                    Respectfully submitted,

                                             JONATHAN DANIEL


                                             By:____/s/ Marc O. Beem_____
                                                   One of his attorneys

Harvey Grossman                              Marc O. Beem
Karen A. Sheley                              Miller Shakman & Beem LLP
Roshni C. Shikari                            180 N. LaSalle St., Suite 3600
ROGER BALDWIN FOUNDATION                     Chicago, IL 60601
OF ACLU, INC.                                Telephone:  (312) 263-3700
180 N. Michigan Ave., Suite 2300             Fax:  (312) 263-3270
Chicago, IL 60601-7401                       mbeem@millershakman.com
Telephone:  312-201-9740
Fax:  312-288-5225                           Everett J. Cygal
hgrossman@aclu-il.org                        Jin Yan
ksheley@aclu-il.org                          Schiff Hardin LLP
rshikari@aclu-il.org                         233 S. Wacker Drive, Suite 6600
                                             Chicago, Illinois  60606
                                             Telephone:  (312) 258-5500
                                             Fax:  (312) 258-5600
                                             ecygal@schiffhardin.com
                                             jyan@schiffhardin.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on the 11th day of December, 2014, he caused the foregoing PLAINTIFF'S CORRECTED OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS to be filed electronically using the CM/EDF system, which will send notification of such filing to the following:

James G. Sotos
Jaclyn McAndrew
Jordan Erickson
The Sotos Law Firm, P.C.
550 East Devon Avenue
Suite 150
Itasca, IL 60143

Ronald D. O'Neal, Jr.
City of Peoria
419 Fulton Street
Room 200
Peoria, IL 61602

Dated:  December 11, 2014                               /s/ Marc O. Beem